**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 22-2687

———————

ROLANDO GALLEGOS TRINIDAD,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA

———————

On Petition for Review of a Decision of the
Board of Immigration Appeals
(Agency No. A206-704-956)
Immigration Judge: Charles M. Honeyman

———————

Argued
June 20, 2023

Before: BIBAS, MATEY, and FREEMAN, *Circuit Judges.*

(Opinion filed: September 19, 2023)

Juliette E. Gomez
Suite 585
P.O. Box 63875
Philadelphia, PA 19147

Karen L. Hoffmann [ARGUED]
Law Offices of Stanley J. Ellenberg
1500 John F. Kennedy Boulevard
Suite 1825
Philadelphia, PA 19102
    *Counsel for Petitioner Rolando Gallegos Trinidad*

Merrick B. Garland
Matthew B. George [ARGUED]
Andrew B. Insenga
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
    *Counsel for Respondent Attorney General of the United States of America*

————————

OPINION*

————————

MATEY, *Circuit Judge.*

Rolando Gallegos-Trinidad challenges a decision of the Board of Immigration Appeals denying his claims for asylum and protection under the Convention Against Torture ("CAT"). But substantial evidence supports the agency's conclusion that Gallegos-Trinidad has not suffered past persecution and asserts only the speculative possibility of future persecution. And the BIA's treatment of Gallegos-Trinidad's CAT claim satisfied due process because it adequately considered Gallegos-Trinidad's evidence and arguments. So we will deny the petition for review.

**I.**

Gallegos-Trinidad is a native of Mexico and a member of the Huave ethnic group indigenous to the Isthmus of Tehuantepec, Mexico. According to Gallegos-Trinidad, "Huave call themselves 'mareños' or 'people of the sea' and are devoted entirely to

—————————————

*This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

fishing in the waters of the lagoon." Opening Br. 2 (quoting A.R. 374, 413). A tradition Gallegos-Trinidad followed fishing off the coast of San Dionisio del Mar.

Sometime after 2009, local officials considered placing a wind farm in the town's communal fishing waters. Many residents, including Gallegos-Trinidad, worried the project would destroy the fishing industry and change their way of life. Others thought development would bring jobs and innovation. Tensions between the two sides simmered. On one occasion, Gallegos-Trinidad and others occupied the municipal palace. On another, he and others blocked a highway. Sometimes Mexican officials sent police to break the blockades and "instill[] fear" in the wind farm opponents, a group Gallegos-Trinidad calls the "land defenders." A.R. 705; Opening Br. 12. In one instance, police asked Gallegos-Trinidad and his companions to turn around as they approached an event to protest. He claims the police "would have turned violent [on them], beating [them] or even shooting [them]" "if [they] had tried to keep going." A.R. 328. He also saw police fighting protestors at another event. But Gallegos-Trinidad was not harmed or directly threatened during either of these incidents.[1]

An Immigration Judge found that Gallegos-Trinidad left Mexico for the United States in 2014 to, at least in part, "better his family economically which is certainly morally defensible and understandable." A.R. 126. Gallegos-Trinidad's entire family

---

[1] Gallegos-Trinidad's brother-in-law, Isaul, was a leader among the land defenders. In October 2012, Isaul encountered a barricade of "100-150 plain-clothed men." Response Br. 8. The men opened the door of Isaul's vehicle and poured gasoline on him. One month later, a large group of state police temporarily surrounded Isaul and others before letting them pass.

3

remains in Mexico, and his wife still lives in San Dionisio with their children. At a hearing in 2016, Gallegos-Trinidad's counsel confirmed that he sent money home to his family "[a]nd to his Assembleia." A.R. 134.

After Gallegos-Trinidad left Mexico, the wind farm project was cancelled, but locals believed "that they will come back to try to do it again." A.R. 705. Gallegos-Trinidad's wife continues to protest and fears pro-development individuals might "do something" to her. A.R. 352. Still, she has not suffered any physical harm, and the only threats she has received have been "shouts." A.R. 354. Gallegos-Trinidad also learned that the mayor's driver "[s]upposedly" shot and injured three individuals during a religious event. A.R. 174–78.

An IJ denied Gallegos-Trinidad's claims for asylum, withholding of removal, and CAT protection. In an oral ruling, he found Gallegos-Trinidad "completely credible," but unable to show past persecution or a sufficiently concrete threat of future persecution. A.R. 63–68. Because Gallegos-Trinidad could not show persecution under the asylum standard, the IJ concluded he could not meet the higher standards required for withholding of removal or CAT protection. After finding no "clear factual or legal error" in the IJ's reasoning, the BIA dismissed Gallegos-Trinidad's appeal. A.R. 4. He timely filed a petition for review.[2]

---

[2] The BIA had jurisdiction to review the IJ's final decision under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction to review Gallegos-Trinidad's petition under 8 U.S.C. § 1252 and will consider both the BIA and IJ's decisions because "the BIA adopt[ed] and affirm[ed] the IJ's decisions and orders as well as conduct[ed] an independent analysis." *Nkomo v. Att'y Gen.*, 930 F.3d 129, 132 (3d Cir. 2019) (citation

## II.

Gallegos-Trinidad met resistance to his political acts in Mexico. But pushback is not persecution, and substantial evidence supports the BIA's conclusion that Gallegos-Trinidad failed to show past persecution or an objectively reasonable possibility of future persecution. That neutralizes his claim for asylum. And because withholding of removal entails a more demanding standard for persecution—and CAT protection requires a possibility of torture—those claims fail as well.

### A.     Asylum Claim

To qualify for asylum, an alien must establish that he is a "refugee" under the Immigration and Nationality Act. 8 U.S.C. § 1158(b)(1)(A). And to establish refugee status, he must show that he "is unable or unwilling to return to . . . [his] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at § 1101(a)(42)(A).

Persecution is essential. Past persecution entails "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) (quoting *Navas v. INS*, 217 F.3d 646, 655 (9th Cir. 2000)). Future persecution must be

---

omitted). We review issues of law de novo and evaluate "the agency's factual findings under the 'highly deferential' substantial-evidence standard." *Sunuwar v. Att'y Gen.*, 989 F.3d 239, 247 (3d Cir. 2021) (quoting *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020)); *see also* 8 U.S.C. § 1252(b)(4)(B).

rooted in an alien's "well-founded fear," meaning the alien "has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." *Chavarria v. Gonzalez*, 446 F.3d 508, 520 (3d Cir. 2006) (quoting *Abdille v. Ashcroft*, 242 F.3d 477, 496 (3d Cir. 2001)).

Gallegos-Trinidad claims he has adequately shown both types of persecution. He argues he 1) endured past persecution because he "suffered a trajectory of harassment . . . on account of his political opinion," Opening Br. 8; and 2) possesses a well-founded fear of future persecution because "similarly-situated individuals, including family members, ha[ve] been threatened, shot, killed or disappeared on account of their political opinion," Opening Br. 15. We find these arguments unavailing.

1.    Past Persecution

Persecution under the INA encompasses only "severe" and "extreme" conduct, such as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Kibinda v. Att'y Gen.*, 477 F.3d 113, 119 (3d Cir. 2007) (quoting *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993)). Threats must be "concrete and menacing" such "that the cumulative effect of the threat and its corroboration presents a 'real threat to [a petitioner's] life or freedom.'" *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 108 (3d Cir. 2020) (quoting *Chang v. INS*, 119 F.3d 1055, 1066 (3d Cir. 1997)).

Substantial evidence supports the IJ's determination that Gallegos-Trinidad failed to show past harm rising to the level of persecution. Gallegos-Trinidad identified two incidents where he felt personally threatened—when police turned him around at a

6

roadblock, and when he went to an event where he "saw state police fighting the protestors and people being beaten." A.R. 327–28. The IJ concluded these threats, coupled with Gallegos-Trinidad's experiences, were not severe enough "to justify a past persecution finding." A.R. 67. We agree. Threats amount to past persecution when they "pose[] a severe affront to the petitioner's life or freedom." *Herrera-Reyes*, 952 F.3d at 108 (citation omitted) (cleaned up). That determination must be made "in the context of the full record." *Id.* In light of Gallegos-Trinidad's experiences, the IJ concluded the threats here were not "menacing [or] imminent such as to cause actual harm," and it remains unclear if all the threats he did face were even associated with his political activity. A.R. 67. All meaning Gallegos-Trinidad failed to establish past persecution.[3]

2.    Future Persecution

Substantial evidence also supports the IJ's determination that Gallegos-Trinidad failed to establish an objectively reasonable possibility of future persecution. To establish a well-founded fear of future persecution, he must first show "a subjective apprehension that persecution will follow repatriation," followed by proof that the apprehension is "objectively reasonable in light of the circumstances." *Huang v. Att'y Gen.*, 620 F.3d 372, 381 (3d Cir. 2010). The IJ found that Gallegos-Trinidad established a subjective apprehension of persecution but failed to show that his fear was objectively reasonable. We see no error in that conclusion.

---

[3] Since Gallegos-Trinidad cannot show past persecution, he is not entitled to a presumption of future persecution, and he retains the burden to show a well-founded fear of future persecution. *See* 8 C.F.R. §§ 1208.13(b)(2) (asylum), 1208.16(b)(2) (withholding).

"The objective component of the analysis requires the alien to show that a reasonable person in his position would fear persecution, either because he 'would be individually singled out for persecution' or because 'there is a pattern or practice in his home country of persecution' against a group of which he is a member." *Huang*, 620 F.3d at 381 (quoting *Sioe Tjen Wong v. Att'y Gen.*, 539 F.3d 225, 232 (3d Cir. 2008)). But based on the evidence Gallegos-Trinidad has presented, it is not reasonably possible he will be singled out for persecution on account of his political opinion or race. *See Doe v. Att'y Gen.*, 956 F.3d 135, 151 (3d Cir. 2020) (citation omitted).[4]

---

[4] To the extent Gallegos-Trinidad now advances a pattern-or-practice theory of persecution, he did not present this theory to the agency. This spells trouble because the INA requires aliens to "raise and exhaust all remedies available to [them] in order to preserve [their] right to appellate review of a final order of removal." *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 422 (3d Cir. 2005); *see* 8 U.S.C. § 1252(d). "Failure to present an issue to the agency constitutes a failure to exhaust." *Isdiati v. Att'y Gen.*, 474 F. App'x 882, 886 (3d Cir. 2012) (per curiam). Gallegos-Trinidad argued to the IJ that "a pattern and practice of persecution of indigenous land-rights activists and human rights defenders in Mexico establish a discernable and objectively reasonable possibility of future persecution." A.R. 741. He invoked the "pattern or practice" language and cited the applicable standards. A.R. 741 (citing 8 C.F.R. §§ 208.13(b)(2), 1208.13(b)(2)(iii)). But the IJ disagreed, concluding Gallegos-Trinidad "ha[d] not met his burden of proof and persuasion that there was, at least, a reasonable possibility of future harm on account of his race, the Huave ethnic group, likely to be expressed political opinions or membership in [a] particular social group." A.R. 68. For the IJ, the possibility of future harm was remote even when accounting for the fact that harm befell "some individuals in the indigenous communities throughout Mexico over the years." A.R. 68; *see also* A.R. 124 (stating Gallegos-Trinidad's evidence is "certainly not enough for a pattern and practice" claim); A.R. 149–50 (similar); A.R. 184 ("[T]his whole case is about whether or not indigenous individuals . . . face a pattern and practice of harm.").

Gallegos-Trinidad then dropped this argument from his appeal to the BIA. He instead argued that the IJ *erred* by "repeatedly characteriz[ing] [Gallegos-Trinidad's political opinion] claim as an indigenous 'pattern and practice' claim." A.R. 18. According to Gallegos-Trinidad, the IJ "did not give fair and full consideration to [his] claim that *he* experienced and would continue to experience persecution on account of *his*

His claims of future harm are "simply too speculative." A.R. 68. As the IJ found, "the windfarm has already been stopped politically and legally." A.R. 66. Any future developments and corresponding controversies are "too speculative to lead to a positive outcome for this case." A.R. 65. The isolated incident regarding protestors shot by the mayor's driver occurred roughly five years ago, and no other protestors have been harmed since. Gallegos-Trinidad's wife and late mother-in-law—both active opponents of the wind farm—remained in San Dionisio and were never harmed. So too with his brother-in-law Isaul, who reports no harm since the decade-old attack.

The safety of his family members undermines Gallegos-Trinidad's claim of future persecution. *See, e.g.*, *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005) ("[W]hen family members remain in petitioner's native country without meeting harm, and there is no individualized showing that petitioner would be singled out for persecution, the reasonableness of a petitioner's well-founded fear of future persecution is diminished[.]"). "In this case, there is little evidence that [Gallegos-Trinidad] would face an individualized risk of persecution any more severe than that faced by [his] family members or other [land defenders] in [San Dionisio]." *Id.*

**B.    CAT Claim**

Gallegos-Trinidad argues the agency's short analysis on the CAT claim violated due process. Due process requires "an individualized determination of [the applicant's]

_____

political opinion" "[b]ecause the [IJ] was determined to analyze the case as an indigenous pattern and practice claim." A.R. 18 (emphasis added). Gallegos-Trinidad cannot argue here what he declined to present to the agency.

interests." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001). Meaning the agency

must "actually consider the evidence and argument that a party presents," *id.* at 549

(quoting *Llana–Castellon v. INS*, 16 F.3d 1093, 1096 (10th Cir. 1994)), keeping in mind

that "the BIA is not required to write an exegesis on every contention," *Toussaint v. Att'y*

*Gen.*, 455 F.3d 409, 414 (3d Cir. 2006) (citation omitted).

This standard was satisfied. The IJ found that Gallegos-Trinidad did not meet "his

burden of proof and persuasion that it is more likely than not that he will be tortured by or

at the instigation of or with the consent or acquiescence of a public official or other

person acting in an official capacity for any level of government in Mexico." A.R. 68–69.

On appeal, Gallegos-Trinidad challenged this conclusion with a one-sentence argument

lacking any record citations. The BIA then held, citing the relevant portion of Gallegos-

Trinidad's brief, that this argument failed to identify any legal or factual errors in the IJ's

reasoning.[5]

### III.

For the foregoing reasons, we will deny Gallegos-Trinidad's petition for review.

---

[5] Though Gallegos-Trinidad initially sought withholding of removal, he has not challenged the IJ's determination that he failed to show a "clear probability" of persecution. So we follow the BIA's course, and consider the withholding issue waived. *See Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 296 n.7 (3d Cir. 2007) ("Absent compelling circumstances not present here, failing to raise an argument in one's opening brief waives it.").

_____

FREEMAN, *Circuit Judge*, dissenting in part.

I join the majority opinion except for the portion of Section II addressing whether Trinidad established an objectively reasonable possibility he would be subjected to persecution if returned to Mexico. The majority declines to address Trinidad's pattern-or-practice theory of future persecution, concluding that he failed to exhaust that argument before the BIA. In my view, Trinidad exhausted the pattern-or-practice argument, so we are obligated to address this aspect of his petition for review. Upon addressing the issue, I would grant the petition and remand to the BIA.

## I.

An asylum applicant can establish a well-founded fear of future persecution by showing that: (i) "he would be individually singled out for persecution on account of a statutorily protected ground," or (ii) "there is a pattern or practice in his home country of persecution against a group of which he is a member." *Doe v. Att'y Gen.*, 956 F.3d 135, 151 (3d Cir. 2020) (internal quotation marks omitted). Trinidad argued to the IJ that he could make the second showing based on political opinion. As the majority notes, Trinidad argued that "a pattern and practice of persecution of indigenous land-rights activists and human rights defenders in Mexico establish a discernable and objectively reasonable possibility of future persecution." Maj. Op. at 8 n.4 (quoting A.R. 741); *see also* A.R. 741 ("There is no requirement to show that [Trinidad] will be individually targeted. A well-founded fear may be established by demonstrating a pattern or practice of persecution of similarly situated groups." (citing 8 C.F.R. §§ 208.13(b)(2), 1208.13(b)(2)(iii))).

1

In support of his political-opinion-based pattern-or-practice argument, Trinidad argued to the IJ that "[i]ndividuals similarly situated to [him] have been shot at or killed not only in San Dionisio, but in other towns resisting the installation of wind parks." A.R. 741. And he provided several examples of such persecution: "In the nearby town of Alvaro Obregon, a member of the town's *Asamblea* and a community patrolman like [Trinidad], was gunned down by a pro-wind farm police officer in July 2018"; "[a]n indigenous land rights defender from Chihuahua was gunned down last month, the 21st land rights defender to be killed in Mexico in 2018"; "Margarito Diaz Gonzalez, an indigenous land rights defender in the State of Nayarit, was shot in the face in September 2018 by armed gunmen"; "[i]n August 2018, indigenous land rights defender Sergio Rivera Hernandez was forcibly disappeared in the State of Puebla after receiving death threats from relatives of the local mayor." *Id.*; *see also* A.R. 232 (article describing July 2018 drive-by shooting that killed land-rights activist in Alvaro Obregon and injured an 8-year-old girl who was walking on the street); A.R. 245 (same); A.R. 238 (article discussing 2018 killing of land-rights defender in Chihuahua); A.R. 240 (article discussing 2018 killing of Margarito Diaz Gonzalez); A.R. 241–44 (article discussing forced disappearance of Sergio Rivera Hernandez in August 2018).

At his November 2018 asylum hearing, he testified that several members of his political assembly had been shot in recent months due to their acts of political resistance "[a]gainst the windmill project." A.R. 177; *see also* A.R. 228 (article reporting that five land-use activists were injured in a March 2018 shooting suspected to have been carried out by agents of San Dionisio del Mar's mayor).

2

At the conclusion of the asylum hearing, the IJ rendered an oral decision from the bench denying the application. The IJ recounted that a court-issued injunction had halted construction of the wind farm in Trinidad's town, and he posited that "the protest and the arguments" against the wind farm "perhaps[] ha[d] been persuasive and successful." A.R. 65. He then explained that the injunction was pivotal to his decision; because the wind farm in Trinidad's town was on hold, so was the risk of violence based on political opinion. *See id.* ("How long that success will last and whether the political and environment[al] balance will be tipped in a different way that will cause a conflict that could place people in physical jeopardy if they were protesting a different outcome politically remains in this Court's respectful view to be too speculative to lead to a positive outcome for this case."). So he determined that Trinidad's objective fear of future persecution on account of his land-use activism was "simply too speculative." A.R. 68.

The IJ did not address the post-injunction violence against members of Trinidad's political assembly and other activists. As described above, Trinidad's evidentiary submissions detailed numerous instances of violence occurring in 2018—well after the 2012 injunction halted the wind farm proposed for his town. Trinidad testified that he and his fellow assemblymembers feared the project could be restarted at any time, so they remained politically active notwithstanding the injunction. Moreover, other wind-farm projects and protests continued in the nearby communities of Juchitan and Alvaro Obregon. *See* A.R. 186 (Trinidad testifying as to the ongoing protests in those communities "against windmills"); A.R. 328 (describing a protest Trinidad attended in Juchitan where he

witnessed "state police fighting the protestors and people being beaten"; "there were guns and I think someone was shot and killed").

## II.

Trinidad appealed to the BIA.  In the section of his brief captioned "Political Opinion Claim," he asserted that the injunction did not mark the end of the political conflict, and he cited supporting evidence:

> [Trinidad] credibly testified that the federal injunction alone will not protect the natural resources from development.  Tr. at 114 ¶ 17-20.  Resistance efforts are ongoing and the respondent remains active in his support.  Tr. at 120 ¶ 1-6.  Objective country conditions evidence makes clear that as long as there is community resistance to corporate development of local natural resources, individuals working to "protect civil, political, economic, social and cultural rights related to the land, territory and the environment" remain vulnerable to attack.  Five members of [Trinidad]'s own political organization were shot by [government] affiliated gunmen in the months leading up to the merits hearing, and a member of an affiliate organization was murdered by a local police officer and wind-farm proponent.  Exh. 4 at Tabs N-O.

A.R. 20.  He explained that those incidents "were just the most recent in a long and uninterrupted string of violence against wind-farm opponents and form part of a greater pattern of violence against land defenders by private interests, often with state collusion." A.R. 14.  He argued that the IJ erred in concluding that the injunction rendered the risk of future violence too speculative.  A.R. 20.

In its decision, the BIA summarized the IJ's ruling: that Trinidad had not established past persecution and that, "while [Trinidad] would continue voicing his political opinion, his fear was too speculative" because "the development of the windfarm had stopped."

A.R. 5. It then concluded that the IJ did not clearly err in determining that Trinidad's fear was too speculative and thus not well-founded. *Id.* Like the IJ, the BIA did not address the post-injunction violence in the record.

## III.

I respectfully disagree with the majority's conclusion that Trinidad dropped his pattern-or-practice argument in his appeal to the BIA. The standard for BIA exhaustion is lenient: "so long as an immigration petitioner makes some effort, however insufficient, to place the Board on notice of a straightforward issue being raised on appeal, a petitioner is deemed to have exhausted her administrative remedies." *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 422 (3d Cir. 2005); *see also id.* (finding exhaustion satisfied because the petitioner put the BIA "on notice that there was a claim of error hovering around" an issue she had not "explicitly" raised); *Nkomo v. Att'y Gen.*, 986 F.3d 268, 272 (3d Cir. 2021) ("Our exhaustion policy is 'liberal.'" (quoting *Joseph v. Att'y Gen.*, 465 F.3d 123, 126 (3d Cir. 2006))). In my view, Trinidad met this standard, so we must review the pattern-or-practice argument on its merits.[1]

---

[1] In his BIA brief, Trinidad posited that the IJ failed to properly consider his political-opinion-based pattern-or-practice claim because the IJ was too focused on a race-based pattern-or-practice claim. *See* A.R. 18 ("[Trinidad] was clear that his claim was principally rooted in his political opinions, rather than his Huave indigenous ethnicity. Tr. at 80 ¶ 9-11. Nonetheless, the Immigration Judge repeatedly characterized the claim as an *indigenous* 'pattern and practice' claim." (emphasis added)). The majority construes this as Trinidad dropping any pattern-or-practice theory in favor of a singled-out-for-persecution theory. Maj. Op. at 8 n.4. I cannot agree. In the "Political Opinion Claim" section of his brief, Trinidad made no argument and pointed to no evidence that he would be individually singled out for persecution. Instead, he directed the BIA to evidence of political violence inflicted on others similarly situated to him. A.R. 18–20.

Upon conducting that merits review, I would remand to the BIA to address the evidence supporting Trinidad's political-opinion-based pattern-or-practice argument. *See, e.g.*, *Huang v. Att'y Gen.*, 620 F.3d 372, 388 (3d Cir. 2010) ("While we are not suggesting that the BIA must discuss every piece of evidence mentioned by an asylum applicant, it may not ignore evidence favorable to the alien, particularly when, as here, the alien's administrative brief expressly calls the BIA's attention to it." (citing *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 107 (3d Cir. 2010) ("[T]he BIA is not permitted simply to ignore or misconstrue evidence in the asylum applicant's favor."))). Trinidad pointed the BIA to evidence of a pattern of violence against land-rights activists that post-dates the wind farm injunction in his town. The BIA ignored this evidence. And although it accurately summarized the IJ's decision that Trinidad's argument was too speculative, it did not address Trinidad's argument that the IJ's decision was inconsistent with the record of post-injunction violence. I would remand with instructions for the BIA to consider that evidence. *See, e.g.*, *Ghebrehiwot v. Att'y Gen.*, 467 F.3d 344, 355 (3d Cir. 2006) (concluding that the IJ failed to address certain evidence the petitioner "submitted that could easily demonstrate an objective basis for a well-founded fear of future religious persecution" and remanding "to the BIA so that the IJ can consider whether the country condition evidence submitted by [the petitioner] establishes a pattern and practice of persecution of Pentecostals by the Eritrean government" (citation omitted)).

\* \* \* \* \*

For the above reasons, I respectfully dissent in part from the majority opinion.

6